THE BOARD OF EDUCATION OF THE COUNTY OF BERKELEY

*v.*

W. HARLEY MILLER, INC., *a corp.*

(No. CC899)

Decided July 5, 1977.

Robert M. Steptoe, Herbert G. Underwood, for plaintiff.

Rice, Hannis & Douglas, Lacy I. Rice, Jr., Martin & Seibert, Clarence E. Martin, Jr., for defendant.

NEELY, JUSTICE:

The Court granted this appeal for the purpose of settling the law of arbitration in this State. The exact issues before us were raised and discussed in the majority opinion by Justice Haden and the concurring opinion by this writer when the case first appeared before us two years ago. See, Board of Ed., etc. v. W. Harley Miller, Inc., ____ W. Va. ____, 221 S.E.2d 882 (1975). The basic issue before us now is to what extent and in what manner a court should enforce an arbitration award, which is rendered without fraud pursuant to a standard arbitration provision in a commercial contract.

This appeal is a certified question which asks whether the circuit court has jurisdiction to enforce an arbitration award upon a motion for summary judgment by the party prevailing at arbitration. The Circuit Court of Berkeley County held that it did not have such jurisdiction, and we reverse.

The factual context in which the issues were presented involves a dispute between the Berkeley County Board of Education (Board), as owner, and W. Harley Miller, Inc. (Miller), as contractor, over Miller's excavation and removal of rock from the North Berkeley High

School construction site. Miller claimed the Board owed him a substantial sum of money above the agreed contract price for this work. The Board resisted Miller's claim by asserting Miller did not follow the contract's procedures for computing the volume of rock in place. To settle the dispute Miller demanded arbitration pursuant to a standard arbitration provision contained in the construction contract with the Board. That contract provision is:

"All claims, disputes and other matters in question arising out of, or relating to this Contract or the breach thereof, ... shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof."

The Board responded to Miller's demand for arbitration by filing a declaratory judgment action in the Circuit Court of Berkeley County and by seeking a preliminary injunction restraining Miller from proceeding to arbitration. The preliminary injunction issued against Miller, pending the outcome of the declaratory judgment action. Following the Circuit Court's denial of Miller's motion to dissolve the preliminary injunction, Miller appealed the injunction order to this Court where we reversed the circuit court and remanded the case with instructions to dissolve the preliminary injunction and to abate the action so that the parties could proceed to arbitration, *Board of Ed., etc. v. W. Harley Miller, supra.*

The dispute was then submitted to a duly selected panel of arbitrators, who rendered their award for $323,291.52 in favor of Miller in November 1976. After receiving the award, Miller filed a Petition to Enforce Award of Arbitrators in the abated declaratory judg-

ment action. On motion of the parties, Miller's petition was taken as a motion for summary judgment and the Board's answer to the petition was taken as an affidavit in opposition to the summary judgment motion. The circuit court then refused to grant the motion for summary judgment, on the ground it lacked jurisdiction, and the circuit court certified the jurisdictional question to this Court.

## I.

The Court has read a large number of conflicting cases on arbitration in this State,[1] the mother Commonwealth of Virginia, and other jurisdictions. Arbitration, apparently, has an enormous potential both for good and for evil. As the concurring opinion recognized in the first *Board v. Miller* case, *supra*, litigation is a poor way to resolve controversies. It is expensive, time consuming, and tends to engender ill will which jeopardizes continuing business relationships. Consequently, where both parties are concerned with speedy, economical, conflict resolution, and harmonious business relations, they will often prefer arbitration to litigation, and incorporate this preference in their contracts. This writer in his concurring opinion in the first *Miller* case, *supra*, tended to emphasize the advantages of arbitration without giving sufficient attention to its disadvantages. *Board v. Miller, supra*, 221 S.E.2d at 886.

---

[1] These cases include:

*Board of Ed., etc. v. W. Harley Miller, Inc.*, W. Va. ____, 221 S.E.2d 882 (1975); *Earl T. Browder, v. Webster County Court*, 143 W.Va. 406, 102 S.E.2d 425 (1958); *Pettus v. Olga Coal Co.*, 137 W.Va. 492, 72 S.E.2d 881 (1952); *Hughes v. National Fuel Co.*, 121 W.Va. 392, 3 S.E.2d 621 (1939); *Boomer Coal & Coke Co. v. Osenton*, 101 W.Va. 683, 133 S.E. 381, (1926); *Morrison Department Stores Co. v. Lewis*, 96 W. Va. 277, 122 S.E. 747 (1924); *Kohlsaat v. Main Island Creek Coal Co.*, 90 W. Va. 656, 112 S.E. 213 (1922); *Flavelle v. Red Jacket Consolidated Coal & Coke Co.*, 82 W. Va. 295, 96 S.E. 600 (1918); *Lawson v. Williamson Coal & Coke Co.*, 61 W. Va. 669, 57 S.E. 258 (1907); *Riley v. Jarvis*, 43 W. Va. 43, 26 S.E. 366 (1896); *Kinney v. Baltimore & Ohio Assn.*, 35 W. Va. 385, 14 S.E. 8 (1891); *Bean v. Bean*, 25 W. Va. 604 (1885); and *Tennant v. Divine*, 24 W. Va. 387 (1884).

Many of the disadvantages of arbitration are detailed in the factual contexts of earlier West Virginia cases which denied enforcement of arbitration agreements. While the results in these prior West Virginia cases may be correct, the legal reasoning is confusing and gives no clear answer to the problem at hand.

The early cases draw directly on *Vynior's Case*, 8 Co. 80a, 81b (1609), decided by Lord Coke. This case is the basic authority for the proposition that at common law a submission to arbitration may be revoked.[2] *Kill v. Hollister*, 1 Wilson 129 (K. B. 1746), followed up on *Vynior's Case* by explaining the rationale for the doctrine of revocability: arbitration agreements, it seemed, ousted courts of their jurisdiction. This rationale has persisted into modern common law arbitration cases, with perhaps one significant modification, the doctrine of condition precedent. *Scott v. Avery*, 5 H. L. Cas. 811 (1856) is the foremost English authority on this doctrine, holding that parties may agree that no cause of action arise upon their contract until after there has been arbitration of contractual disputes. The Commonwealth of Virginia, before West Virginia became a state, had incorporated the doctrine of *Scott v. Avery* as well as the underlying doctrine of revocability into her common law which then passed into our own law. *See, Condon v. South Side R. Co.*, 55 Va. (14 Gratt.) 302 (1858).

Very little illumination with regard to the proper rule for arbitration and the underlying social policy support-

---

[2] As Coke stated in *Vynior's* case:

". . . if I assign auditors to take an account; or if I make one my factor; or if I submit myself to an arbitrament; although these are made by express words irrevocable, or that I grant or am bound that all these shall stand irrevocably, yet they may be revoked: so if I make my testament and last will irrevocable, yet I may revoke it, for my act or my words cannot alter the judgment of the law to make *that* irrevocable, which is of its own nature revocable."

Ironically, the statement in this case of the doctrine of revocability of arbitration agreements was *dictum*. Nonetheless, despite its questionable origin, the doctrine became firmly established in the common law.

ing that rule can be gleened from the prior West Virginia cases because they talk in terms of "jurisdiction," "conditions precedent", "implied conditions precedent", and "revocability". Most of the prior West Virginia cases indulge in what this writer would call a rule selection process, and contain little cogent functional analysis.

## II.

The basic problem in all arbitration cases could probably best be explained not in terms of legal characterizations such as "conditions precedent," "ousting courts of their jurisdiction," or "revocability," but rather by a hypothetical case in the tradition of the ancient fableist Aesop. Let us assume for a minute that for some reason all the rabbits and all the foxes decided to enter into a contract for mutual security, one provision of which were that any disputes arising out of the contract would be arbitrated by a panel of foxes. Somehow that shocks our consciences, and it doesn't help the rabbits very much either.

Now, what happens if we have the same contract with the same arbitration provision, except that disputes will be arbitrated by a panel of wolves? Is there such a community of interest among foxes and wolves that the wolves cannot be impartial? Possibly. Now what happens if disputes will be resolved by a panel composed of one squirrel, one elephant, and one wolf? One might conclude that squirrels look like rabbits, wolves look like foxes, and elephants ought surely to be impartial.

Animal law becomes procedurally very complex if for a moment we assume *arguendo* that we will absolutely prohibit an arbitration provision which provides for arbitration by a panel of foxes, and that we will also prohibit arbitration by a panel of wolves in recognition of their community of interest with foxes. What happens then if there is a sincere effort to obtain a fair panel of arbitrators, as for example the squirrel, elephant, and wolf, and the decision in a forthcoming dispute is expected legitimately to go against the rabbits?

The rabbits, whom we may logically assume will have retained the services of some sharks to represent them, will go into court and plead "wolfery", that is to say, that the elephant also has a community of interest with the foxes and wolves, so that for all intents and purposes it is the same as if he were a wolf, which is the same as a fox. The rabbits will obviously demand a hearing and a full-blown jury trial on the question of whether an elephant looks more like a squirrel or more like a wolf, and as soon as the law gives the rabbits a hearing, the foxes, relying in good faith on arbitration, might as well kiss themselves goodbye, because not only will they be forced to go to arbitration, but they will also be forced to go through the whole thing again in court either in the first instance when the rabbits seek to enjoin arbitration, or after arbitration when they, the foxes, seek to enforce their award. The purpose of arbitration, namely just, speedy, economical conflict resolution is defeated if the foxes must demonstrate the fairness of the procedure in order to disprove the allegation of "wolfery".

However, if the courts attempt to avoid the problem of the frivolous plea of "wolfery", by writing strong syllabus points making arbitration provisions absolutely binding and enforceable in all cases, then all the fox lawyers come out of the woodwork and begin writing arbitration provisions, with wolves for arbitrators, into all contracts, regardless of the nature of the transaction. If the foxes are blessed with a strong bargaining position they will be able to take advantage of unwary rabbits on all occasions and defeat the prosecution of just claims against themselves.

### III.

A functional analysis of the West Virginia cases which do not favor arbitration demonstrates that this Court would not countenance an arbitration provision by which the parties agree that all disputes will be arbitrated by a panel chosen exclusively by one of the parties. This is the classic rabbits and foxes situation, with

the foxes stacking the arbitration panel in their favor. Such a contract provision is inherently inequitable and unconscionable because in a way it nullifies all the other provisions of the contract. While we do not have a case presenting that set of facts, we may conceptualize it as one extreme in a spectrum going from arbitration as a means of defeating just claims to arbitration as a speedy, economical means of conflict resolution. The concurring opinion in the first *Miller* case, *supra*, reaches the problem of defeating just claims in part by discussing the problem presented by arbitration provisions in contracts of adhesion where one party to a contract is confronted by another party which holds a monopolistic or oligopolistic position.

The West Virginia case of *Kinney v. Baltimore & Ohio Employees' Relief Assn.*, 35 W. Va. 385, 14 S.E. 8 (1891) is representative of a line of cases which are apparently predicated on the concept of fairness and disapprove arbitration. In that case a widow sued for death benefits payable because of the accidental killing of her husband on the railroad. Although the constitution of the relief association required that all disputes be submitted to arbitration, and the panel included one arbitrator selected by each party and a third selected by the first two, the court applied the common law principle that contracts to arbitrate are revocable. In *Kinney* the parties were a widow and a large association; the Court obviously concluded that arbitration served no useful purpose, and that somehow under these circumstances the arbitration procedure could only be used to defeat a just claim. More particularly, one can infer that the arbitration provision was not bargained for and that the policyholder had her legitimate expectations defeated by recourse to a provision which was meaningless to the untrained person. Generally in cases where arbitration has been rejected the facts are more compelling than the logic. *See also: Lawson v. Williamson Coal & Coke Co.*, 61 W. Va. 669, 57 S.E. 258 (1907) and *Kohlsaat v. Main Island Creek Coal Co.*, 90 W. Va. 656, 112 S.E. 213 (1922).

However, West Virginia also has a line of cases which favors arbitration. These cases resulted from this Court's development and extension of the doctrine of condition precedent, which, as it turns out, gives courts a convenient means to escape the rigid strictures of the common law revocability doctrine. A look at the facts and the results in these cases indicates that this Court has been using the doctrine of condition precedent to enforce arbitration agreements whenever a close examination of the agreements reveals their fundamental fairness. For a good example of this process, *see Pettus v. Olga Coal Co.*, 137 W. Va. 492, 72 S.E.2d 881 (1952). It is the exact opposite of the rabbits and foxes situation, because both parties in *Pettus* were probably foxes.

In *Pettus* members of a labor union brought an action in court against their employer for overtime pay they claimed the employer wrongfully withheld. These employees did not comply with the provisions of their collective bargaining contract requiring disputes to be settled by arbitration, and the employer resisted their suit on this basis. The situation clearly called for the court to stay its hand so that labor contract grievance procedures could serve the legitimate purposes for which they were intended. Yet the common law doctrine of revocability indicated that the parties could freely bypass arbitration and proceed to court. The obvious solution was to apply the doctrine of condition precedent, which the *Pettus* court did. The doctrine was extended somewhat in *Pettus* since there was no language expressly conditioning a right of action on compliance with arbitration procedures. Thus the court was forced to find such a condition by implication, and stated the rule as follows:

> "A contract providing a procedure for arbitration of disputes, and providing that 'all claims, demands or actions growing therefrom or involved therein shall be by the contracting parties settled and determined exclusively by the machinery provided in the' contract, creates a condition precedent to any right of action or suit arising under the contract." Syllabus point 3, *Pettus v. Olga Coal Co., supra.*

What *Pettus* really stands for, after the haze of its convoluted legal reasoning has settled, is that where there are two sophisticated parties, on the one hand unionized employees and on the other a major coal company, and where the arbitration clause was bargained for and was intended by both parties to provide an effective alternative to litigation, then the courts should require both parties to proceed to arbitration.

Under the facts of the case before us what we have are two sophisticated parties, one a substantial contractor and the other a governmental unit; there is a standard arbitration clause providing for arbitrators to be selected through the American Arbitration Association from a panel of experienced and impartial arbitrators; the parties were represented by counsel, or should have been represented by counsel, and could have been represented by counsel; and, the dispute which arose under the contract is a standard rock excavation dispute which occurs with such predictable regularity that both developers and contractors routinely expect it. Furthermore, rock clause and similar common disputes are more susceptible to equitable resolution when the decision is made by arbitrators experienced in the building industry who can take notice of far more information than a common law judge could safely notice.

## IV.

In spite of all the reasons for being suspicious of arbitration, the weight of modern, enlightened authority favors arbitration as a preferred means of conflict resolution.[3] The process has probably been most fully

---

[3] The current rule in most jurisdictions is that parties who have agreed to resolve their disputes by arbitration are bound by their word. *McCormack v. Bloomfield S. S. Co.*, 399 F.Supp. 488 (S.D.N.Y., 1974); *Borough of Ambridge Water Authority v. Columbia*, 458 Pa. 546, 328 A.2d 498 (Pa. 1974); *Loukonen v. MacKay*, 490 P.2d 78 (Colo. App. 1971). This rule is often stated in obverse form, *viz.*, that parties cannot be required to arbitrate any dispute which they have not agreed to arbitrate. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, (1960); *Butler Products Company v. Unistrut Corp.*, 367 F.2d 733 (7th Cir., 1966); *Divi-*

developed in the area of labor law,[4] which is a unique
area having rules which are not necessarily applicable

---

sion 1205, Amal. Trans. U. v. Greyhound Lines, Inc., 323 F.Supp.
219 (D.C. Mass., 1971), Anheuser-Busch, Inc. v. Brewers and Malt-
sters Local Union No. 6, 346 F.Supp. 239 (E.D.Mo., 1972). By this
rule agreements to arbitrate are enforceable under general princi-
ples of contract law and therefore subject to invalidation only inso-
far as general contract law provides. Son Shipping Co. v. DeFosse
& Tanghe, 199 F.2d 687 (2d Cir., 1952); Lowry & Co. v. S. S. Le
Moyne D'Iberville, 253 F.Supp. 396 (S.D.N.Y., 1966), appeal dis-
missed, 372 F.2d 123 (2d. Cir., 1967); Mendelson v. Shrager, 432 Pa.
383, 248 A.2d 234, (1968); Riccardi v. Modern Silver Linen Supply
Co., Inc., 356 N.Y.S.2d 872, 45 A.D.2d 191 (1974), aff'd., 373 N.Y.S.2d
551, 335 N.E.2d 856 (1975).

The debate among the jurisdictions today is not whether an
agreement to arbitrate is binding, but how far courts should reach
to infer such an agreement where none has been expressly provid-
ed by the parties. Although some jurisdictions hold that the court
cannot go beyond the explicit terms of the contract to find an
agreement to arbitrate, Flood v. Country Mut. Ins. Co., 41 Ill.2d 91,
242 N.E.2d 149, (1968); Allstate Ins. Co. v. Cook, 21 Ariz. App. 313,
519 P.2d 66 (1974), the trend among the jurisdictions is to hold that
the court is to apply ordinary principles of contract interpretation
to determine whether the parties have impliedly agreed to arbi-
trate, or submit particular issues to arbitration. Tepper Realty
Company v. Mosaic Tile Company, 259 F.Supp. 688 (S.D.N.Y., 1966);
Ludwig v. Marion Laboratories, Inc., 465 F.2d 114 (8th Cir., 1972);
Super Mkt. Serv. Corp. v. General Drivers, Etc., Loc. U. 229, 340
F.Supp. 1143 (M.D.Pa., 1972). These latter decisions certainly accord
more harmoniously with the current contract approach to enforc-
ing arbitration agreements.

[4] ".. in the landmark Steelworkers trilogy of 1960, the Supreme
Court indicated that courts would be closed to the challenge of
arbitration awards in most cases. The Court limited the courts' role
'to ascertaining whether the party seeking arbitration is making a
claim which on its face is governed by the contract,' [United Steel-
workers of America v. American Manufacturing Co., 363 U.S. 564
(1960)] created a strong presumption favoring arbitration in con-
tract disputes, [United Steelworkers of America v. Warrior & Gulf
Navigation Co., 363 U.S. 574 (1960)] and, finally, held that if the
arbitrator's award is based on the relevant agreement, the courts
must enforce the agreement and not consider the case de novo,
regardless of whether the court agrees with the award or even if it
finds the award is ambiguous, [United Steelworkers of America v.
Enterprise Wheel & Car Corp., 363 U.S. 593 (1960)]." Board of Edu-
cation v. W. Harley Miller, Inc., ___ W. Va. ___ 221 S.E.2d 882 at
888, 889 (1975) (Neely, J. concurring.)

in other areas. Yet there is still something to be gleened by analogy from the labor situation. Fairly hard and fast general rules can be developed in labor law because the factual patterns recur with predictable regularity. Labor contracts are always entered into by business parties, *i.e.*, on the one hand an organization of workers with a paid staff and experienced counsel, and on the other hand an industrial or commercial enterprise also with experienced counsel. Labor agreements usually result from real bargaining about the terms of the contract, particularly the "no strike" clause and the arbitration clause. Both union and management have a continuing interest in the solvency of the business enterprise which is providing profits to management and employment to workers, and both sides want to avoid work stoppages which will curtail profits on one side and eliminate wages on the other. Any attempt to develop a general rule about arbitration from labor law precedent must take account both of the nature of the parties to a labor contract and of the goals of those parties.

The case before us presents again the difficulty with which courts have wrestled for three hundred years. Experience seems to indicate that in formulating rules of arbitration one must either make the rule that an agreement to arbitrate is specifically enforceable and any cause of action is extinguished by the award of the arbitrators or merged into it, whenever it appears from a fair reading of the contract that the parties intended arbitration to be the exclusive means of resolving contractual disputes, or one must forget about arbitration as a viable alternative to the normal common law litigation process. As soon as the law attempts to incorporate protections for the unwary in the law of arbitration, then the entire purpose of arbitration is defeated, at least with regard to litigious, recalcitrant, or contumacious parties. In the hypothetical above, this is the case where the rabbits plead "wolfery" and demand a hearing with full-blown court proceedings, thus avoiding speedy, economical, conflict resolution.

If we say, as this writer did in the concurring opinion in the first *Miller* case, *supra:*

> "Procedures for arbitration can be spelled out in the contract. When such procedures are not spelled out fully the arbitrators should be free to use any procedure they see fit. The scope of agreements to arbitrate should be liberally construed. The parties contract for an arbitrator, not a procedure. Due process does not necessarily mean Anglo-American legal rules of evidence, nor winner-take-all substantive rules. Furthermore, once the parties have agreed to arbitrate, they ought not to be allowed to re-litigate the same issues in the courts. The system of review of arbitration awards should be set up to avoid delay caused by the losing party in arbitration challenging the award of the arbitrators, *especially on mere procedural grounds!* The strict rules governing an action at law have never been applicable to an arbitration proceeding, *Boomer Coal & Coke Co. v. Osenton,* 101 W. Va. 683, 133 S.E. 381 (1926). The parties should know this when they agree to arbitrate, and they should not be heard later to complain on an issue of procedure. Arbitration can, and almost inevitably does, decide the substance of the controversy with substantial justice regardless of procedure."

then we have created a rule where the arbitration award is enforceable and there are no frivolous defenses which would be conducive to relitigation of the entire issue in the circuit court. However, we have then created a monster of equally frightful mien. Is it possible to devise any protection for the unwary which is not an invitation to a trial *de novo* under the guise of searching for procedural errors, prejudice on the part of arbitrators, and numerous other issues which will make arbitration a curse instead of a blessing? How can we create any defense other than fraud to an arbitration award without having the defenses eat the rule and frustrate the process?

## V.

If arbitration is ever to have a useful place in our jurisprudence, it is essential that we address the problem which we caricature as the contract between the rabbits and foxes, in which the foxes impose the clause that all disputes will be resolved by a panel of foxes, or by a panel of wolves. In real life we can envisage arbitration provisions being imposed upon consumers in contract situations where consumers are totally ignorant of the implications of what they are signing, and where consumers bargain away many of the protections which have been secured for them with such difficulty at common law.

To solve this problem we enounce a new rule of law which is generally consistent with the results in prior cases, but which conceptualizes the problem in different, functional terms. Where parties to a contract agree to arbitrate either all disputes or particular limited disputes arising under the contract, and where the parties bargained for the arbitration provision, then, arbitration is mandatory, and any causes of action under the contract which by the contract terms are made arbitrable are merged, in the absence of fraud, with the arbitration award and the arbitration award is enforceable upon a complaint setting forth the contract, the arbitration provision, and the award of the arbitrators upon motion for summary judgment made at the proper time.

The important words in the new rule are that the agreement to arbitrate must have been "bargained for." The concurring opinion in the first *Miller* case, *supra*, spoke of the traditional contract of adhesion situation in which one party to a contract may be confronted by another party which holds either a monopolistic or oligopolistic position in some particular line of commerce. While this exception would appear to address the most likely avenue for abuse in the law of arbitration, there are two more which should be specifically mentioned. Whenever a party can bring an arbitration clause within the unconscionability provisions of § 2-302 of the Uni-

form Commercial Code, *W. Va. Code*, 46-2-302 (1963), then that, too, would indicate that there was no meaningful bargaining with regard to the arbitration provision and should invalidate it. Furthermore, when arbitration is wholly inappropriate, given the nature of the contract, and could only have been intended to defeat just claims, the provision cannot be considered to have been bargained for.

The question of whether an arbitration provision is "bargained for" must, in order to make arbitration workable, always be a matter of law for the court to determine and never a question of fact. Under modern case law in other jurisdictions there is a strong presumption that an arbitration provision is part of the bargain. Therefore in West Virginia only if it appears from the four corners of a written contract or from the obvious nature of the contracting parties, or from the obvious nature of the activity covered by the contract, that the arbitration provision is so inconsistent with the other terms of the contract or so oppressive under the circumstances that it could not have been bargained for, should a court refuse to enforce the arbitration provision.[5]

The end result of the rule which we enounce today is that all arbitration provisions in all contracts which indicate that the parties intended to arbitrate their differences rather than litigate them are presumptively bind-

---

[5] Determining as a matter of law whether arbitration agreements should be enforced is a judgment that courts are experienced in making. For example, insurance contracts covering property against casualty loss often provide for arbitration if the insured and his insurer dispute the amount of loss. Courts must refuse to enforce the arbitration agreement, however, when the loss is total, even though the arbitration agreement is valid in every respect. *Maynard v. National Fire Insurance Co. of Hartford*, 147 W. Va. 539, 129 S.E.2d 443 (1963); *Nicholas v. Granite State Fire Ins. Co.*, 125 W. Va. 349, 24 S.E.2d 280 (1943); and *Hinkle v. North River Ins. Co.*, 70 W. Va. 681, 75 S.E. 54 (1912). While such determinations stem in part from West Virginia's "valued policy law" *W. Va. Code*, 33-17-9 (1957), they nevertheless demonstrate the courts' competence to make such decisions as matters of law.

ing, and specifically enforceable. Accordingly we hold in the case before us that the circuit court erred in not enforcing the arbitrators' award.

## VI.

The defendant Board, in the case at bar, alleges that the law of arbitration in West Virginia at the time it entered into the contract with Miller was such as to make the whole procedure of arbitration a nullity. Consequently, the Board argues that when the contract provision says that the award of the arbitrators shall be enforceable in accordance with general law, the clause is meaningless because the general law neither made arbitration a condition precedent to litigation nor made the award specifically enforceable.

The Court concedes that the law on arbitration has been unclear in this jurisdiction for a number of years; however, we are not persuaded that the collected precedent of this State when read together stood for the propositions that arbitration agreements were nullities and that arbitration awards would not be enforced. At least the *Pettus* case, *supra*, indicated that arbitration would be a condition precedent to litigation if such intention were thoroughly implied in the contract provision, and numerous other cases have indicated that arbitration awards would be enforced under appropriate circumstances.[6] Consequently, we do not find compelling the Board's argument that it relied to its detriment upon an obvious interpretation of this State's decisional law at the time the contract was entered into. In order, however, to eliminate confusion in future cases resulting from conflicting and perplexing earlier cases which may have arrived at correct results, but through reasoning which by today's functional standards is obsolete, we hereby

---

[6] *See e.g., United Fuel Gas Co. v. Columbian Fuel Corporation,* 165 F.2d 746 (4th Cir. 1948); *Hughes v. National Fuel Co.,* 121 W. Va. 392, 3 S.E.2d 621 (1939); *Boomer Coal & Coke Co. v. Osenton,* 101 W. Va. 683, 133 S.E. 381 (1926); and *Billmyer v. Hamburg-Bremen Fire Ins. Co.,* 57 W. Va. 42, 49 S.E. 901 (1905).

overrule the reasoning of all prior inconsistent West Virginia cases.[7]

----

[7] This footnote surveys some of West Virginia's significant older arbitration cases in an attempt to show how the law has developed to date, to assess the impact of today's decision on these older cases, and to overrule so much of prior decisional law as is inconsistent with the rule enounced in the case before us. The first case to be examined is *Bean v. Bean*, 25 W. Va. 604 (1885). This case involved a dispute between two brothers, A. M. Bean and J. J. Bean, one of whom brought suit against the other both on the law side and on the chancery side of the court. Both brothers had served as administrators of their father's estate and the two suits related to matters arising out of the settlement of their father's estate and out of transactions between the brothers in connection with that estate. While the suits were pending, the following order was entered in both of them:

> By consent of parties this cause is referred to J. E. Middleton as arbitrator to take and settle all accounts between plaintiff and defendant and finally to determine their claims in full against each other upon evidence taken by and laid before him and the arbitrator is ordered to give ten days notice to the counsel of record of the time and place of taking the account.

The named arbitrator, Middleton, investigated the matter and filed his report with the court. His report was limited to "such part of the matters referred to him as in his opinion came legitimately within the scope of his authority, being the matters involved in the suit at law only." When the report was filed with the court, the court entered an order requiring the parties to show cause in the law case alone why the arbitration award should not be entered as the judgment of the court. Responding to the show-cause order, the defendant objected to the entry of the arbitration award as the judgment of the court on the ground that the award varied from the terms of the submission to arbitration, as it did not resolve matters then pending on the chancery side of the court. The trial court nonetheless entered the arbitration award as its judgment in the law case, after which the defendant appealed to the Supreme Court, which reversed. The rule of the case as expressed in its syllabus pt. 2 is "an award to be valid must be final and certain, it must adjudicate all matters submitted, and if it leaves any such matter open for future controversy, it is invalid." This rule is not disturbed by today's holding, and it is still possible to attack collaterally an arbitration award which varies from the terms of submission to arbitration.

The case of *Riley v. Jarvis*, 43 W. Va. 43, 26 S.E. 366 (1896) deals primarily with procedural formalities concerning arbitration, but it deserves some mention here. In this case Oscar F. Riley brought assumpsit in the Taylor County Circuit Court against the defen-

In addition, the arbitration provision in question was a fair one, it was bargained for, and it provided a reasonable method of conflict resolution. The Board owes Harley Miller money and should pay without further delay; the arbitration provision provided for two eventu-

---

dants Claude S. Jarvis and Granville E. Jarvis and the circuit court rendered judgment against the defendants. On appeal the defendants resisted the judgment entered against them on the ground that another action for the same cause was pending against them before a justice of the peace in which action the controversy had been submitted to arbitration. The submission to arbitration was still pending at the time the circuit court action was brought against the defendants. In the appeal the Supreme Court reviewed the existing common law of arbitration to determine whether the pending arbitration would bar the suit in the circuit court. Because a submission to arbitration was revocable at common law any time before award, the Supreme Court determined that the submission could not stand as a bar to suit. However, the Supreme Court noted that in this case the submission to arbitration was irrevocable since it was made pursuant to rule of court. Accordingly, the submission could be pleaded in abatement to any subsequent suit, although not in bar. The reason for limiting the plea to abatement was that the submission alone, although irrevocable, did not and could not resolve the merits of the dispute. The logical procedure was to delay the second suit or abate it pending the final outcome of the submission to arbitration in the first suit. Upon the entry of an arbitration award following submission, and after all challenges to the award had been resolved, there would be time in the second suit to determine if the arbitration award would bar further proceedings. Today's decision does not affect the rule in *Riley v. Jarvis* insofar as an irrevocable submission to arbitration can be pleaded in abatement to subsequent suits on the same cause of action. However, it should be clear that today's decision makes irrevocable submissions to arbitration which the *Riley* court would have termed revocable, thus considerably enlarging the number of cases brought within the scope of the *Riley* holding.

While *Riley v. Jarvis* concerned the effect of a submission to arbitration, an earlier case, *Tennant v. Divine*, 24 W. Va. 387 (1884), concerned the impact of an arbitration award itself. *Tennant* stands for the basic proposition that when arbitration has proceeded to award and the parties have agreed that the award shall be entered up as a judgment of the court, the court cannot refuse to enter judgment upon the award unless there are circumstances shown which legitimately impeach the award. In *Tennant* the circuit court refused to enter the arbitration award as its judgment and was reversed on appeal by the Supreme Court. Today's deci-

alities. First, in the event that a dispute arose, the parties agreed to arbitrate; second, if after arbitration one of the parties declined to abide by the arbitrators' award, the other party could bring an action on the

---

sion, which concerns primarily the force and effect of an agreement to arbitrate, in no way changes the long-standing rule set forth in *Tennant v. Divine.*

Another significant early arbitration case is *Lawson v. Williamson Coal & Coke Co.*, 61 W. Va. 669, 57 S.E. 258 (1907). The question in Lawson was whether a coal lessor has the right to recover the minimum royalty and certain tax payments provided for in the written lease from the lessee who never took possession of the leased premises. While a number of errors are assigned and discussed in the opinion, only one is important here: the defendant coal company's assignment that the plaintiff lessor's cause of action did not accrue until after an arbitration award had been made in accordance with the terms of the written lease. The court did not pause long in consideration of this assignment of error, and upon the authority of *Kinney v. Baltimore & Ohio Assn.*, 35 W. Va. 385, 14 S.E. 8 (1891) [discussed in the text above] concluded that the arbitration agreement was no bar to suit by the lessor in these circumstances since arbitration was not expressly made a condition precedent to the right to sue on the contract. Today's decision overrules the reasoning of both *Lawson* and *Kinney*. Likewise the reasoning of the similar case of *Flavelle v. Red Jacket Consolidated Coal & Coke Co.*, 82 W. Va. 295, 96 S.E. 600 (1918) is overruled. The dispute in *Flavelle* concerned whether the defendant coal company had removed all available marketable coal in accordance with the terms of its lease. A dispute arose between the parties concerning this matter, which the lease required to be submitted to arbitration. The Supreme Court, relying on *Kinney, supra,* for authority, found that the arbitration provision did not expressly or by necessary implication make such arbitration a condition precedent to suit. It should be noted that in both the *Lawson* and *Flavelle* cases the Supreme Court may have been concerned with the fact that the defendant coal companies were using arbitration clauses to harass or delay the plaintiffs in the just resolution of their disputes. The means by which the Supreme Court was able to hold in favor of the plaintiffs in these cases was the common law revocability doctrine. Today's decision eliminates the use of that doctrine in similar circumstances. However, it should be noted that our discussion of disparity in bargaining power and our holding in that respect may provide in the future an alternate ground for dealing with situations such as those presented in the two coal company cases. While we offer no opinion as to those cases, it may be that the plaintiff lessors gained the sympathetic ear of the court by

award in court. If, indeed, the Board cynically entered into an agreement to arbitrate with the full intention of declining to fulfill its commitment and of deliberately defrauding the other party from a benefit bestowed by

virtue of an unfair bargain struck with them by the defendant coal companies. If such were the case, we would understand why the court in *Lawson* and in *Flavelle* was anxious for the plaintiffs to have their day in court. In this regard *see also Kohlsaat v. Main Island Creek Coal Co.*, 90 W. Va. 656, 112 S.E.213 (1922). After today's decision, however, the means by which the courtroom door was opened, namely manipulation of the common law revocability doctrine, would no longer be available. Accordingly, when courts in the future are concerned with this problem, they must address it directly and follow the guidelines set forth in today's opinion on arbitration agreements which are unfairly exacted.

*Morrison Department Stores Co. v. Lewis*, 96 W. Va. 277, 122 S.E. 747 (1924) involved a dispute between owners of two adjoining city lots which had a common party wall. In arbitration under their contract the defendant had been found liable to plaintiff for certain costs relating to the construction of the party wall. The defendant resisted the arbitration award on the ground that he had expressly revoked the arbitration agreement. The court declined to accept this argument and instead upheld the arbitration award. This is a result with which we are very much in accord and we approve *Morrison* to the extent that it seeks to encourage arbitration and uphold arbitration awards. However, to reach the result that it did in *Morrison,* the court resorted to a procedural formality. That is, it found that defendant's revocation of arbitration was ineffective since it was set forth in a document (without seal) not equal in dignity to the document originally establishing arbitration (under seal). Given the state of the common law at the time of *Morrison,* the court's approach was imaginative. However, after today's decision resort to such procedural technicalities would be unnecessary.

The Supreme Court again resorted to a procedural technicality as a ground for decision in the case of *Earl T. Browder, Inc. v. Webster County Court,* 143 W. Va. 406, 102 S.E.2d 425 (1958). This case involved a dispute between Earl T. Browder, Inc., a building contractor, and Webster County, concerning Browder's work on the Webster County Memorial Hospital. Interestingly, the fact situation is the converse of *Morrison.* In *Morrison* the defendant attempted to resist an arbitration award on the ground that the arbitration agreement had been revoked. In *Browder,* the defendant attempted to resist the lower court's judgment in favor of the building contractor on the ground that arbitration called for in their contract had not taken place. The *Browder* court took a fairly modern view and did not use the traditional revocability doctrine

the contract, then the Board can hardly be heard to complain that it relied "in good faith" upon the state of the decisional law. It did not rely in good faith. *Ex turpi causa non oritur actio.*

---

or the condition precedent doctrine to justify the plaintiff's bringing the cause of action before arbitration had taken place. Rather, the court examined the record closely to find that the defendant had in fact waived its right to demand arbitration.

We do not today overrule the *Browder* case insofar as it holds that arbitration can be "excused by waiver or for other good cause as a refusal or failure by a party to proceed with the arbitration." Syllabus pt. 3, *Browder.* Thus a party cannot refuse to participate in arbitration, or otherwise obstruct the arbitration process, and be heard later to complain in court that the cause of action is brought prematurely against it because there has been no arbitration. Despite the fact that we hold today that arbitration agreements in most circumstances are irrevocable, that does not mean that one party to an arbitration agreement can never institute court action against the other party before arbitration is concluded, if the other party refuses to perform its obligations under the arbitration agreement.

The final case remaining to be considered is *Hughes v. National Fuel Co.*, 121 W. Va. 392, 3 S.E.2d 621 (1939). The dispute in *Hughes* concerned whether the defendant, National Fuel Co., as lessee, had removed coal to a sufficient height from a coal seam leased to it by the plaintiff lessors. The coal lease between the parties contained the following, fairly common language: "In the event of difference arising between the lessors and the lessee, under the terms of this agreement, or the construction of any clause thereof, or the rights and obligations of the lessors or the lessee hereunder, all such questions shall be determined by arbitration, but pending arbitration between the parties hereto, there shall be no cancellation or forfeiture of this agreement. In all such cases the matters in difference shall be referred to two arbitrators, one to be chosen by the lessors and one by the lessee, and if said arbitrators cannot agree, they shall select a third, and the decision of any two of such three arbitrators shall be final and binding, and shall be accepted as such by the parties hereto." Pursuant to this provision, the parties submitted their controversy to arbitrators, two out of the three of whom rendered an arbitration award adverse to the claim of the plaintiff lessors. Following this award, the plaintiffs instituted a chancery suit in the Circuit Court of Monongalia County for the purpose of abrogating the arbitration award. Their attack on the award had three main grounds stated in the decision as follows: "(1) that arbitrator McCutcheon acted as an advocate, witness and agent for the defendant when the matter in controversy was being heard by the arbitrators; (2) that the award was not responsive to

For the foregoing reasons the judgment of the Circuit Court of Berkeley County on the certified question is reversed and the case is remanded to the circuit court with directions to enter judgment forthwith upon the award of the arbitrators.

*Rulings on certified question reversed and remanded with directions.*

---

the questions submitted for arbitration; (3) that the award on its face discloses palpable error." The circuit court struck out the defendant's answer to the plaintiff's allegations and invalidated the arbitration award without hearing evidence. The Supreme Court reversed and remanded the case with directions for the circuit court to take proof with respect to plaintiff's allegations. The *Hughes* court was clearly unwilling to countenance an attack against an arbitration award unless proof of irregularity should appear. We do not endorse even this limited approach except to the extent that actual fraud rather than mere mistake is alleged. To the extent that *Hughes* implied that a court should grant a hearing upon challenges to the arbitration award not amounting to actual fraud, it is overruled, and to the extent that it stands for the enforceability and presumptive regularity of arbitration awards, it is approved.

Finally for emphasis we state and endorse syllabus pt. 3 of the *Hughes* case; "Awards by arbitration are to be favorably and liberally construed and are not to be set aside unless they appear to be founded on grounds clearly illegal." For an elaboration on such grounds, *see Board of Ed., etc. v. W. Harley Miller, Inc.,* ___ W. Va. ___, 221 S.E.2d 882 (1975), (Neely, J.concurring), which states as follows: "Furthermore, unless there be a clear showing of manifest fraud, corruption, or clerical error, resort to the courts after submission to arbitration should meet with summary judgment in favor of the award. I hasten to add that fraud and corruption are far different animals than procedural irregularity." *Id.* at 888 The reasoning of the majority opinion in *Board v. Miller, supra* is expressly overruled.

While this survey of West Virginia case law is by no means exhaustive, it does include a representative sampling of most varieties of West Virginia common law arbitration cases. The principles announced in this opinion and elaborated upon in this footnote are applicable to all other cases presenting the same or substantially similar fact patterns, and such other cases are distinguished, overruled, or endorsed in the same measure as the cases discussed above.

MILLER, JUSTICE, *concurring:*

If, as the majority intones, litigation is a poor way to resolve controversies as it is expensive and time consuming, what must the parties to this arbitration case think as to the efficacy of arbitration in the context of the two years and two appeals to this Court?

The issue before us *was* simple: whether the arbitration award could be enforced in the original declaratory judgment action, which proceeding is more fully outlined in *Board of Education of County of Berkeley v. W. Harley Miller, Inc.*, ___ W. Va. ___, 221 S.E.2d 882 (1975).

This is an uncomplicated procedural question relating to how one can enforce an arbitration award. As our first decision in this case pointed out, the arbitration did not arise under the arbitration statute, W. Va. Code, 55-10-1, but rested on the private contractual agreement of the parties.

This Court clearly stated in *Hughes v. National Fuel Company*, 121 W. Va. 392, 3 S.E.2d 621 (1939), that in order to enforce a common law award of arbitration, it is necessary to bring an action based upon the award.

The only question remaining to be answered here was whether the contractor, W. Harley Miller, Inc., which had obtained the award, could enforce it in the existing declaratory judgment action or whether it was required to file a new suit.

Rule 15 of the W. Va. Rules of Civil Procedure accords great liberality to amended and supplemental pleadings. In *Nellas v. Loucas*, ___ W. Va. ___, 191 S.E.2d 160 (1972), and *Rosier v. Garron, Inc.*, ___ W. Va. ___, 199 S.E.2d 50 (1973), we rejected any rigid test for amendment to pleadings in terms of whether the cause of action has been changed and in lieu thereof stated in Syllabus Point 3, *Rosier v. Garron, Inc., supra:*

> "The purpose of the words 'and leave [to amend] shall be freely given when justice so requires' in Rule 15(a) W.Va. R.Civ.P., is to secure an adjudication on the merits of the controversy

as would be secured under identical factual situations in the absence of procedural impediments; therefore, motions to amend should always be granted under Rule 15 when: (1) the amendment permits the presentation of the merits of the action; (2) the adverse party is not prejudiced by the sudden assertion of the subject of the amendment; and (3) the adverse party can be given ample opportunity to meet the issue."

Clearly, the lower court under Rule 15 had jurisdiction to admit an amended claim to enforce the arbitration award.

Based upon the theory that the only issue in the present case was the procedural question of how an arbitration award can be enforced in the courts, I consider the bulk of the majority opinion to be mere dicta. The reference to "animal law" is not only inapt, but completely extraneous to any issue in the case.

Finally, I object to the use of federal labor cases involving arbitration as precedent in the area of commercial arbitration. In *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 4 L. Ed. 2d 1403, 80 S. Ct. 1343 (1960), the foundation of the federal labor arbitration law was based on Section 203(d) of the Labor Management Relations Act, 1947, 61 Stat. 153, 29 U.S.C. §173(d), which established labor arbitration as a favored policy for resolution of grievances.

One has only to read the dissenting opinion in *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960), to sense the distress at the majority's failure to apply commercial arbitration law principles to labor arbitration, although the majority had taken considerable pains to demonstrate the difference between these two concepts of arbitration:

"Courts and arbitration in the context of most commercial contracts are resorted to because there has been a breakdown in the working relationship of the parties; such resort is the un-

wanted exception. But the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government." [363 U.S. at 581]

Regrettably the majority of this Court, by entwining labor arbitration cases with commercial arbitration cases, ignores Justice Cardozo's admonition in *Lowden v. Northwestern Bank & Trust Co.*, 298 U.S. 160, 165, 80 L. Ed. 1114, 56 S. Ct. 696 (1936):

"When things are called by the same name it is easy for the mind to slide into an assumption that the verbal identity is accompanied in all its sequences by identity of meaning."

I am authorized to state that Justice McGraw joins with me in this concurring opinion.