363 S.E.2d 460

**JACKSON ENTERPRISES, LTD.**

v.

**PROCIOUS PUBLIC SERVICE DISTRICT.**

**No. 17345.**

Supreme Court of Appeals of West Virginia.

Nov. 17, 1987.

E.E. Thaxton, Norman Daniels, Charleston, for Procious Public Service District.

Carl L. Fletcher, Jr., Charleston, for Jackson Enterprises.

NEELY, Justice:

In 1982, Jackson Enterprises, Ltd., contracted with the Procious Public Service District to construct a water system consisting of distribution and service lines, a pressure reducing station, water treatment plant, meters and fire hydrants. Construction was begun in October, 1982 and was completed in August, 1983. While construction was in progress, a dispute arose between the parties concerning the cost of extra work occasioned by requirements of the West Virginia Department of Highways. On the first day of construction, work was interrupted by the West Virginia Department of Highways for compaction tests. There were several other occasions when the work was delayed and interrupted by the Department of Highways, but a more serious problem arose from a Department of Highways demand that the contractor not use soil excavated from the trenches as backfill to close the excavated trench after the waterline had been laid.

The contractor was required by the Department of Highways, through Procious, to excavate all the trenches within the non-traveled portion of the roads along which the pipes were being laid and to haul away the excavated dirt and then backfill the trench with new, approved material. This extraordinary procedure was imposed by the Department of Highways upon Procious, which then ordered Jackson to comply. But such a procedure was not required under the Department of Highways permit, the construction contract, or industry standards, and it was not custom and usage to impose such a requirement upon utilities using the non-traveled portions of highway rights-of-way.

Before a public service district can install any utility line along a public road, a Department of Highways permit is required. The permit requires a surety bond to be posted by the Public Service District to assure the Department of Highways that

all work performed within the public right-of-way will be in accordance with the requirements of *W.Va.Code*, 17–16–6 [1949] which provides in part:

> The work shall be done under the supervision and to the satisfaction of the commission [commissioner] or court [county commission]; and the entire expense of replacing the highway in as good condition as before shall be paid by the persons to whom the permit was given, or by whom the work was done
> . . .

When the contract documents for construction of the Procious waterline were prepared for Procious by its engineer, the Department of Highways permit obligations to restore disturbed areas within highway rights-of-way were simply passed on to the contractor, Jackson Enterprises, Ltd. According to well established custom, a contractor performs work along a public road according to the requirements of the Department of Highways permit issued to the Public Service District. Jackson Enterprises maintained at the arbitration hearing in this case that it was intended in the contract, based on custom and usage, that when excavation was performed on the non-traveled portion of the public right-of-way the excavated material would be replaced in the trench and the road thereby restored to "as good condition as before." *W.Va.Code*, 17–16–6 [1949].

When construction began, compaction tests indicated that the waterline excavations outside the traveled portion of the highway met or exceeded the permit requirements because the trenches were backfilled or replaced to original or better condition using the same material removed from the trenches. However, a Department of Highways inspector demanded that all excavated areas be restored to a compaction standard used for *traveled* portions of new highways. To achieve compaction standards higher than the original conditions, the contractor was ordered by Procious to haul away the material excavated from the trenches, dump it, and to haul in approved material that would be compacted to new highway standards. When Jackson objected, the job was shut down. Jackson

refused to resume construction until expressly ordered to do so by Procious and even then the work was resumed under protest. Jackson notified the Public Service District that extra costs were due for the shutdown delay and that more serious costs were mounting to restore trenches to better than original condition.

Approximately one month after construction began, Jackson gave written notice to Procious in accordance with Paragraph 7 of the Contract General Conditions that subsurface conditions differed from those anticipated and that additional costs would continue to be incurred as a result of the drastic changes in the contractor's manner and method of construction demanded by Procious, resulting in significant additional work. The contract clause to which Jackson referred provides as follows:

17. Subsurface conditions

17.1  The CONTRACTOR shall promptly, and before such conditions are disturbed, except in the event of an emergency, notify the OWNER by WRITTEN NOTICE of:

17.1.1  Subsurface or latent physical conditions at the site differing materially from those indicated in the CONTRACT DOCUMENTS; or

17.1.2  Unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in WORK of the character provided for in the CONTRACT DOCUMENTS.

17.2  The OWNER shall promptly investigate the conditions, and if it is found that such conditions do so materially differ and cause an increase or decrease in the cost of, or in the time required for, performance of the WORK, an equitable adjustment shall be made the the CONTRACT DOCUMENTS shall be modified by a CHANCE ORDER. Any claim of the CONTRACTOR for adjustment hereunder shall not be allowed unless the required WRITTEN NOTICE has been given' provided that the OWNER may, if the OWNER determines the facts so justify, consider and adjust any such claims

asserted before the date of final payment.

In March, 1983, Jackson filed a demand for arbitration against the Public Service District pursuant to Paragraph 30 of the Contract General Conditions and the Construction Industry Arbitration Rules. The demand for arbitration specifically notified Procious of the following claims, disputes and other matters arising out of the contract:

1. "You are hereby notified that Jackson Enterprises, Ltd. does, by this correspondence, hereby demand arbitration of the claims, disputes and other matters in question, arising out of the CONTRACT previously referred to and the lack of agreement *concerning responsibility for payment for extraordinary amounts of bedding material and backfill previously determined to be unsuitable for use on the project."* [Emphasis added]

2. "This demand *also* includes a request for payment in the amount of *$18,-337.00 for work suspensions and delays* encountered by the CONTRACTOR in performance of the work." [Emphasis added]

This demand for arbitration stated two separate claims. The first claim was for the owner's refusal to recognize the existence of subsurface conditions that had resulted in additional costs to the contractor, and the second for work suspensions and delays.

Paragraph 30 of the contract dealing with arbitration provided:

All claims, disputes, and other matters in question arising out of, or relating to, the contract documents or the breach thereof, except for claims which have been waived by the making and acceptance of final payment as provided by Section 20, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. This agreement to arbitrate shall be specifically enforceable under the prevailing Arbitration Law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in any court having jurisdiction thereof.

A hearing was scheduled before the arbitrator for 27 July 1983. Before the hearing, Jackson presented its claim booklet that set forth a detailed breakdown of the claim from 6 October 1982 to 27 July 1983 in the amount of $367,695.28. Procious requested a continuance until 17 August 1983 in order to prepare its defense because it claimed surprise and the continuance was granted. On 17 and 18 August 1983, after Procious had prepared its case, the matter was heard before the arbitrator. The hearings were conducted over a two day period and each side presented expert witnesses along with voluminous documents to support its case. Every issue was fully addressed by Procious, which at no time objected to the issues submitted. In fact, counsel for Procious specifically agreed to submit every issue to the arbitrator for his decision under the contract.

On 22 September 1983, the American Arbitration Association by its arbitrator, issued an award in favor of Jackson for $391,502.58. This total award was comprised of an award for $389,130.08 plus an administrative fee previously advanced by Jackson to the American Arbitration Association of $2,372.50.

The Public Service District failed to pay Jackson as required by the arbitration award and Jackson filed a complaint in circuit court for judgment on the award. On 20 August 1984 the circuit court of Lincoln County granted summary judgment in favor of Jackson, but after judgment was entered Procious requested a new hearing based upon "newly discovered evidence" and "fraud" on the part of the arbitrator and the contractor. On 22 May 1985 the circuit court remanded the case to the arbitrator to consider a 28 August 1984 audit report cited as "new evidence" and any other relevant evidence. On 20 February 1986 an additional hearing was held before the arbitrator, but at the hearing Procious abandoned its fraud claim and stated on the record that it had found no fraud or evidence of fraud and did not believe fraud existed. On the "newly dis-

covered evidence" issue, Procious admitted it had no new facts to present but, instead, offered the arbitrator an audit report that confirmed substantially all the extra work performed, but concluded that the contractor's evidence could support an award of only $2,483.14. At that hearing, Procious offered only one exhibit, the audit report.

On 14 April 1986, the arbitrator modified the original award to include accrued interest from the date of the earlier award, but in all other regards affirmed the original ruling. On 20 May 1986, the Circuit Court of Lincoln County amended its previous judgment order in favor of Jackson to reflect the arbitrator's modified award and it is from that judgment of the circuit court that Procious appeals here.

The Public Service District advances four assignments of error that relate primarily to factual rather than legal issues. We have carefully reviewed the record in this case and find all of them without merit.

I

■ The Public Service District's first assignment of error is that the arbitration award varied from the terms of the submission to arbitration. In this regard Procious asserts that it was surprised by Jackson's claim for $367,695.28 because Procious had gone to arbitration expecting that only the $18,237 claim would be adjudicated. Nonetheless, the demand for arbitration quoted above clearly indicates that there were two separate counts on which arbitration was sought; to the extent that Procious was "surprised," the "surprise" was cured when the arbitrator adjourned the proceedings for over twenty days to allow full and fair preparation and presentation of Procious' case. Furthermore, when the arbitration proceedings were reconvened there was no request for a further continuance, nor do we find any objection made on the record to the arbitrator's going on to dispose of all claims.

The case before us is almost exactly on all fours with *Board of Education v. W. Harley Miller*, 160 W.Va. 473, 236 S.E.2d 439 (1977) where we said:

Under the facts of the case before us what we have are two sophisticated parties, one a substantial contractor and the other a governmental unit; there is a standard arbitration clause providing for arbitrators to be selected through the American Arbitration Association form a panel of experienced and impartial arbitrators; the parties were represented by counsel, or should have been represented by counsel, and could have been represented by counsel; and, the dispute which arose under the contract is a standard rock excavation dispute which occurs with such predictable regularity that both developers and contractors routinely expect it. Furthermore, rock clause and similar common disputes are more susceptible to equitable resolution when the decision is made by arbitrators experienced in the building industry who can take notice of far more information than a common law judge could safely notice.

236 S.E.2d at 445.

The contract document in this case takes up 201 pages of the record and sets forth numerous detailed specifications. One provision, entitled "Trenched Construction & Backfill" (Page 1.2.40) sets forth the following specifications:

After the conduit pipe or other underground facility is installed, selected embankment material, free from large lumps, clods or rocks shall be placed along the pipe in layers not exceeding six (6) inches loose depth and compacted by means of approved mechanical tampers to ninety-five (95%) percent density at optimum moisture as determined by the West Virginia Department of Highways' Testing Procedures MP712.21.22. *In areas outside the construction and maintenance limits of the highway, compaction to the density of the original ground is sufficient.* A bulldozer or other blade shall not be used in placing backfill. However, mechanical equipment with various type buckets may be used. Care shall be taken to compact the material under the haunches of the conduit pipe or other facility to place the backfill evenly on each side, and to avoid

displacement of conduit. This method of backfilling and compacting shall be followed until the top of the trench is reached. In sections where a cut is to be made to establish the new highway, the above backfilling requirements shall be continued until the fill meets the level of the new highway template. [Emphasis added]

■ Jackson claimed that ordinarily compaction standards are met when excavated material is backfilled into a trench and that much of the soil encountered in this project was of such low quality—an entirely unforeseeable event—that frequently acceptable compaction standards could not be met with excavated material. Furthermore, under the express language quoted above, namely, "[i]n areas outside the construction and maintenance limits of the highway, compaction to the density of the original ground is sufficient," the contract itself does not require any higher standard than restoration to the original condition. Thus the contract itself is in accord with *W. Va. Code*, 17–16–6 [1949]. Certainly any ambiguity in the entire paragraph relating to trench construction and backfill was properly to be resolved by the arbitrator. The arbitrator had all the relevant evidence before him and both sides had ample time to prepare their cases.

## II

■ Procious next asserts that the award exceeded the scope of the arbitration clause. We have a hard time finding even colorable merit in this allegation because the arbitration clause clearly provides that: "*All* claims, disputes, and other matters in question arising out of, or relating to, the contract documents or the breach thereof, except for claims which have been waived by the making and acceptance of final payment as provided by Section 20, shall be decided by arbitration ..." [Emphasis added]. Certainly this claim does not come within the "final payment" exception. As we pointed out in *Miller, supra,* "rock clauses" are exactly the type of disputes most likely to go to arbitration because the nature of the subsoil is one of those things about which neither party has exact knowledge at the time the contract is made. Here, we have an analogous situation: both the West Virginia statute governing restoration of highways to their original condition and custom and usage led the parties to expect one type of excavation only to have their expectations entirely confounded by circumstances beyond their control.

## III

■ Next the Public Service District asserts that the award was made in violation of the Construction Industry Arbitration Rules. In this regard it is alleged, but not supported by *any* reference to the record, that the parties were entitled to three arbitrators and that Procious was coerced by a threat to stop work on the project if it did not agree to one arbitrator. Yet we have reviewed the Rules of the American Arbitration Association and find that under those rules there is *no entitlement whatsoever* to more than one arbitrator unless the *parties' contract* specifically so provides. The entire arbitration provision of the contract, paragraph 30, is set forth in the introduction to this opinion and it makes no reference to providing more than one arbitrator. Appointment of the arbitrator is governed by Rule 13, *Construction Industry Arbitration Rules* which provides in part:

If the parties have not appointed an arbitrator and have not provided any other method of appointment, *the arbitrator* shall be appointed in the following manner: immediately after the filing of the demand or submission, the AAA shall submit simultaneously to each party to the dispute an identical list of names of persons chosen from the panel. Each party to the dispute shall have seven days from the mailing date in which to cross off any names to which it objects, number the remaining names to indicate the order of preference, and return the list to the AAA.... From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the

AAA shall invite the acceptance of an *arbitrator* to serve.... [Emphasis added].

Rule 13, quoted above in part, was submitted to us as an Appendix to Procious' brief, but it is directly at odds with Procious' assignment of error. Consequently, we find no procedural deviation in the arbitration proceeding from the express contract terms or the rules of the American Arbitration Association.

## IV

Finally, Procious asserts that the award was procured through gross mistake of law and was therefore void. This assignment is obviously frivolous: the contract specifically provided that "unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in WORK of the character provided for in the contract documents ..." would give rise to a claim for adjustments. The arbitration clause provided that all claims under the contract would be arbitrated.

As this Court said in *Clinton Water Association v. Farmers Construction Co.,* 163 W.Va. 85, 254 S.E.2d 692 (1979):

It has long been the rule in this State that where parties have undertaken arbitration, their award is binding and may only be attacked in the courts on the basis of fraud or on those grounds set out in *W.Va.Code,* 55–10–4. These principles are more fully set out in Syllabus Point 1 and 2 of *Boomer Coal Coke Co. v. Osenton,* 101 W.Va. 683, 133 S.E. 381 (1926):

"Where the matters in controversy in an action at law are submitted by the parties to arbitration, under the provisions of the statute, and all parties thereto are afforded an opportunity to be heard and present all their evidence to the arbitration tribunal, the court will not thereafter, on an application to set aside the award made therein, review the evidence submitted for the purpose of determining the correctness of said award, in the absence of corruption or partiality in the arbitrators, or fraud practiced by one of the parties to the arbitration."

"In such cases, where the strict rules of legal procedure are waived under the terms of the arbitration, the award will not be set aside for a mistake of law, unless it is so glaring as to shock the conscience and warrant the conclusion that the arbitrators were biased, prejudiced, or influenced by some ulterior motive."

163 W.Va. at 87, 254 S.E.2d at 694.

We also pointed out in *Clinton, supra,* that "once an arbitration award has been rendered, it is not easily impeached." The reasons for the virtual impregnability of arbitration awards were articulated in *Boomer Coal & Coke Co. v. Osenton,* 101 W.Va. 683, 133 S.E. 381 (1926) as follows:

An arbitration, while it partakes of the nature of a quasi-judicial proceeding, it is not such a proceeding in a technical sense. It is a domestic tribunal as distinguished from a regular organized court. The very existence of the tribunal depends upon the voluntary actions of the disputants. They select their own judges. Its object and aim is to arrive at a just determination of the matters in dispute, and finally dispose of the same in a speedy and inexpensive way. The arbitrators are usually laymen, inexperienced in the technical rules of law, selected because of their intelligence and integrity, and with the belief that they will do substantial justice between the parties. To require an arbitrator to follow the fixed rules of law in arriving at his award would operate to defeat the object of the proceeding. The courts of this country have adhered with great steadiness to the general rule that awards will not be set aside for errors of law or fact on the part of the arbitrators.

101 W.Va. at 693, 133 S.E. at 385.

The ancient wisdom of *Boomer Coal & Coke Co., supra,* was reaffirmed as recently as 1983 in *Barber v. Union Carbide Corp.,* 172 W.Va. 199, 304 S.E.2d 353 when we said in syllabus point 4:

When a commercial contract sets forth a particular method for arriving at a decision by an arbitrator, the parties are entitled only to the procedure for which they bargained and courts will not impose upon arbitrators concepts of "due process" developed in the courts in the face of explicit contractual provisions that provide other less time consuming and less expensive methods of dispute resolution.

Therefore, for the reasons set forth above, the judgment of the Circuit Court of Lincoln County is affirmed.

Affirmed.