359 S.E.2d 117

**Arthur L. ANDERSON, et al.**

**v.**

**Cecil NICHOLS and N.F. Mining Co.**

**No. 17336.**

Supreme Court of Appeals of
West Virginia.

June 16, 1987.

Gerard R. Stowers, Bowles, McDavid, Graff & Love, Charleston, for appellants.

Charles R. McElwee, Robinson & McElwee, Charleston, for appellee.

NEELY, Justice.

Mr. and Mrs. Arthur Anderson, the appellees in this case, are the owners of certain tracts of contiguous coal lands in Nicholas County. On 15 July 1983, Mr. and Mrs. Anderson leased all of the coal on these lands to the appellant, Cecil Nichols for an initial term of five years, subject to renewal for a maximum of fifteen years. The lease provided for a minimum royalty of $8,750 per month, and Mr. Nichols, as lessee, was required, under the terms of the lease, to mine the coal for the full term or until he had mined "all of the merchantable and minable coal" from the premises. With Mr. and Mrs. Andersons' consent the lease was subsequently assigned by Mr. Nichols to N.F. Mining Company. Mr. Nichols, however, continued to be liable for full performance under the terms of the contract.

On 23 March 1984, N.F. Mining Company and Mr. Nichols ceased mining operations and attempted to surrender the lease. Pursuant to Section 13 of the lease, Mr. and Mrs. Anderson demanded arbitration. On 15 July 1985, a majority of the three-man arbitration panel rendered a decision in favor of the Andersons. The panel awarded Mr. and Mrs. Anderson $105,000 in damages consisting of the following:

1. $17,500 representing unpaid royalties for the months of February and March, 1984, pursuant to Section 5 of the lease;

2. $35,000 representing minimum royalties for four (4) months minimum notice (April, May, June and July), pursuant to Section 6 of the lease; and,

3. $52,500 for an additional six (6) months minimum royalty, pursuant to Section 8 of the lease (Diligence in Mining Methods).

The minority report concurred in the award of $17,500 (unpaid royalties) and $35,000 (minimum royalties), but disagreed with the $52,500 award for failure to exercise diligence in mining methods.

Mr. Nichols and N.F. Mining Company declined to pay the award. Mr. and Mrs. Anderson then sued in circuit court where they moved for summary judgment on the arbitrators' award under *Clinton Water Ass'n v. Farmers Const. Co.*, 163 W.Va. 85, 254 S.E.2d 692 (1979). Mr. Nichols and N.F. Mining sought to defeat the summary judgment motion by alleging procedural irregularities in the arbitration process. Mr. Nichols and N.F. Mining asserted that: (1) the arbitrator selected by the Andersons was biased; (2) the award was made in an untimely manner; and, (3) part of the award was "punitive" damages. The lower court properly rejected these challenges and granted summary judgment in favor of Mr. and Mrs. Anderson.

We granted this appeal to refine further our holding in *Bd. of Education v. W. Harley Miller, Inc.*, 160 W.Va. 473, 236 S.E.2d 439 (1977), which has provided the basis of our commercial arbitration law for the last ten years. The particular subject of our concern today is the allegation made by the appellants that one member of the arbitration panel was biased in favor of the appellees. We find, however, that none of the allegations made against Mr. Fish, the arbitrator selected by the appellees, rises to the level of "manifest fraud [or] corruption" required by footnote 7, *Bd. of Education v. W. Harley Miller, supra*, at 160 W.Va. at 494, 236 S.E.2d 451. Accordingly, we affirm.

I

The lease/sublease in the case before us required the lessees to remove all merchantable and minable coal (a term defined in the lease/sublease) from the leased premises. When the lessees surrendered the lease/sublease claiming that all merchantable and minable coal had been removed, a dispute arose between the lessors and the lessees. The lease/sublease contains a provision that disputes of that nature arising under the contract are to be settled by arbitration. That provision says:

... one arbitrator shall be selected by lessors and one by lessee within ten days after notice in writing from either party to the other specifying the need for arbitration and the issue or issues to be arbitrated; the two so selected shall select a third arbitrator within five days after their selection.... The decision or

award of the arbitrators shall be made in writing within fifteen days from the final submission of the issue or issues to them. The decision or award of the arbitrators, or a majority of them shall be binding upon the parties and shall be the exclusive means of settling all claims, disputes or actions growing herefrom or involved herein. . . .

Pursuant to this clause, the lessors selected Samuel E. Fish as an arbitrator and the lessees selected Larry Tucker. Mr. Fish and Mr. Tucker then selected Quin Morton, III as the third arbitrator. Hearings were held on the question of whether the lessees had removed all the merchantable and minable coal on 11 June 1985 and the arbitrators set 24 June 1985 as the day for submission of the case. The order of arbitration in which arbitrators Fish and Morton joined and to which arbitrator Tucker dissented in part was issued on 15 July 1985, six days after the time specified in the lease's arbitration clause for rendering an award.

In their arbitration order, arbitrators Fish and Morton made five findings, namely:

(1) That all the merchantable and minable coal had not been mined or removed from the leased premises.

(2) That the lessees had not diligently and continuously prosecuted their mining efforts to the end that all merchantable and minable coal had been removed.

(3) That lessees' notice to surrender was deficient in that it did not provide for four months advanced notice prior to the cessation of mining operations, nor was supporting documentation tendered after ten days demand was made in the notice to cure default.

(4) That Nichols is jointly liable with N.F. Mining Company for any award of damages made in the order of arbitration.

(5) That Nichols violated the lease/sublease by removing all property and mining equipment from the leased premises before all royalty payments had been made.

Based upon these findings, arbitrators Fish and Morton made two separate monetary awards, each totaling $52,500 in favor of the lessors. The first was comprised of an award of $17,500 representing two months of minimum royalties for the months of February and March 1984 plus $35,000 for four months of minimum royalties. This latter $35,000 was assessed because the lessees had not given a notice to the lessors of at least four full calendar months before surrendering the lease. Mr. Tucker, the arbitrator selected by the appellants, concurred in this award totaling $52,000.

However, arbitrators Fish and Morton awarded an additional $52,500, representing six months of minimum royalties, for the following reasons:

(a) Nichols and N.F. Mining failed to drive through the fault or thin coal area in entries to the left of the straight main entries where the coal had thinned to 25-½ inches and had not drilled at least one diamond core hole ahead of these entries (Lease, Section 1, Paragraph 5).

(b) Nichols and N.F. Mining failed to drive the straight main entries when the coal thinned to 27-½ inches and had not drilled at least one diamond core hole ahead of these entries (Lease, Section 1, Paragraph 5).

(c) Nichols and N.F. Mining failed to drive entries to the right of the main entries for not less than 200 feet and to drill diamond core holes ahead of the entries (Lease, Section 1, Paragraph 5).

(d) Charles R. Hoover, Mining Engineer, estimated 225,000 tons of minable and merchantable coal to the right of the main entries.

(e) Robert H. Dunlap, Land Surveyor, letter dated April 26, 1984, did not address minable and merchantable coal reserves (Lessee's Exhibit No. 2).

(f) Nichols and N.F. Mining abandoned their lease and the property in a very abrupt and arrogant manner in complete disregard to the terms of the Lease.

Based on Nichols' disregard for the terms of the Lease, we assess Nichols an

additional six months minimum royalty in the amount of $52,500. (R. 44–45).

 The appellants now focus on reason (f) (that finds that Mr. Nichols and N.F. Mining abandoned their lease and the property in a very abrupt and arrogant manner) to sustain their complaint that the second $52,500 award was punitive damages. Even if the second award were punitive damages, however, we would not set it aside on that grounds alone. Arbitrators, like courts, are entitled to award punitive damages [1] in appropriate circumstances as compensation for oppressive conduct. Nonetheless, it is obvious from all the reasons stated by the arbitrators that the primary basis for the second $52,500 award was that there remained 225,000 tons of minable and merchantable coal for which the lessors were entitled to royalties.

During oral argument in this court the parties agreed that formulating a jury instruction outlining how damages for unmined coal should be calculated would be difficult. Although the lessors are entitled to royalties, they still own the coal and at some future time they can sell it. Yet, because the appellants admit that there were roughly 225,000 tons of minable and merchantable coal left, it is hard to see how the lessors under *any* jury instruction could have done *worse* in court than they did with the arbitrators. If royalties were about $3 per ton, lessors might have gotten as much as $675,000 from a jury.

## II

 Appellants would have us believe that it is of great moment that the arbitration award was rendered six days later than specified in the arbitration agreement. Had the arbitration clause provided that time was of the essence in the arbitration process we might agree with the appellants; however, there was no agreement by the parties that a late award would nullify the whole arbitration proceeding and we see no reason to set aside an otherwise exemplary decision for a *de minimis* delay.

A fair reading of the cases indicates that in instances when an arbitration award is delayed courts must apply a rule of reason. The threshold question then becomes whether the party raising the delay issue has been prejudiced by the delay. In this regard the complaining party is more likely to show prejudice by long delay than the party against whom the complaint has been made because arbitration is a substitute for court action. Usually, however, the delay issue is used only to establish colorable grounds for challenging an otherwise just and reasonable award to postpone paying off the winner. We disapprove of that tactic. As is usual in these cases that use delay to buy more delay, we have in the case before us only a classic example of *damnum absque injuria* (more commonly expressed in the coal fields as "no hurt, no foul"). [2]

1. Where the damages are genuinely intended to be punitive and bear no reasonable relation to the prevailing party's commercial loss, they are beyond the scope of the arbitrator's power. *Garrity v. Lyle Stuart Inc.*, 40 N.Y.2d 354, 386 N.Y.S.2d 831, 353 N.E.2d 793 (1976). However, ritualistic incantations of "punitive damages" will not suffice to vacate an arbitration award where discretion is in the computation of damages. *Board of Education, etc. v. Niagra-Wheatfield Tchrs. Assn.*, 415 N.Y.S.2d 790, 46 N.Y.2d 553, 389 N.E.2d 104 (1979). Other courts agree it is within the arbitrator's power to consider questions of business morality in determining awards. Such an award, however liberal, does not amount to an "unlawful" assessment of punitive damages. *South East Atlantic Shipping Ltd. v. Garnac Grain Company*, 356 F.2d 189 (2nd Cir.1966). Liberal awards are always allowable if the award has a rational basis. *City of Troy v. Troy Police*, 439 N.Y.S.2d

483, 81 A.D.2d 730 (N.Y.A.D.1981); *Aronson Textile Corp. v. Gene Ostrow of California, Inc.*, 423 N.Y.S.2d 9, 73 A.D.2d 545 (1979); *Port Jefferson Station Tchrs. Assn. v. Brookhaven*, 400 N.Y.S.2d 132, 60 A.D.2d 604, *affirmed* 411 N.Y.S.2d 1, 45 N.Y.2d 898, 383 N.E.2d 553 (1978); *Belardinelli v. Werner Continental, Inc.*, 128 N.J.Super. 1, 318 A.2d 777 (1974).

2. An arbitrator's authority finds its source in contract and therefore the general common-law rule was that an award not rendered within a party-established time limitation is void. *R.E. Bean Const. Co. v. Middlebury Associates*, 139 Vt. 200, 428 A.2d 306 (1980); *Librascope Inc., v. Precision Lodge No. 1600*, 189 Cal.App.2d 71, 75, 10 Cal.Rptr. 795, 797 (1961); *In re Broadway 40th Street Corp.*, 296 N.Y. 165, 167, 71 N.E.2d 451, 452 (1947). This, however, is not the better rule and it confounds the logic of *Bd. of Education v. Miller*, 160 W.Va. 473, 236 S.E.2d 439

## III

The primary complaint of the appellants, however, is that arbitrator Fish was biased on behalf of the appellees. Appellants ground this complaint upon an affidavit of arbitrator Tucker which said:

That in the course of the arbitrators deliberation Mr. Fish stated that prior to his having been selected as an arbitrator he had visited the coal mine involved in the arbitration at the request of Mr. Anderson in anticipation of being an expert engineering witness on behalf of Mr. Anderson in the arbitration proceedings, that he had formed an opinion based upon his view of the coal mine that Cecil Nichols and N.F. Mining Company had not recovered all the merchantable and minable coal from the leased premises, and that he had conveyed that opinion to Mr. Anderson.

That in the course of the arbitrators deliberations, Mr. Fish undertook to influence the arbitrators decision by stating that based upon his visit to the coal mine Nichols and N.F. Mining Company could have found merchantable and minable coal had they driven entries to the right of the main entries.

Thus we are squarely presented with a recurring problem in arbitration law—namely, how to handle an allegation of partiality when an arbitrator is selected under a standard arbitration clause that provides that each party shall name one arbitrator and the two so named shall then agree upon a third. Our first foray into this field occurred in *Wheeling Gas Co. v. The City of Wheeling*, 5 W.Va. 448 (1872), where in syllabus points 8 and 9 we held as follows:

Parties who really intend to have their rights decided by impartial judges are entitled to insist that all of the arbitrators shall be impartial. But if they are content to submit questions in controversy to those who are known to have formed and expressed opinions upon the subject matter, or who are known to have partialities and prejudices for or against the respective parties, an award made by such arbitrators is binding.

Under such circumstances, a gas company, who selected one of its stockholders as an arbitrator, who with the arbitrator selected by the other party chose an umpire, ought not to be heard to impeach an award. Especially as the testimony discloses that the amount of the award seems to be fair.

In a consistent line of cases beginning with *Bd. of Education v. Miller, supra,* it has been this Court's policy to encourage arbitration among commercial parties as an alternative to litigation.[3] Furthermore, to the maximum extent possible we have attempted to avoid exactly the type of problem that has arisen in this case. Here the award of the arbitrators was eminently fair; a just conclusion was reached expeditiously, economically, and without the technical constraints of complex legal rules. Yet the payment of the award in this case has been delayed by imaginative challenges in both the trial and appellate courts.

The appellants allege lack of fairness because the arbitrator appointed by the appellees had prior business dealings with the appellees; yet, the record discloses that the appellants' arbitrator, Mr. Tucker, is a signatory upon the appeal

(1977). However, a short *de minimis* delay by which no one is harmed should not be permitted to void the prolonged efforts of the arbitrators. *Tomczak v. Erie Ins. Exchange,* 268 F.Supp. 185, (D.C.Pa.1967). The delay must not be too long, must not be the fault of the parties, and the work done by the arbitrators preceding the making of the award must be substantial. *Pinegree v. State Court of Mediation and Arbitration,* 130 Mich. 229, 89 N.W. 943 (1902). At least in labor contracts, time limitations for filing an arbitration award have been considered to be directory rather than mandatory.

*Dearborn Fire Fighters Union v. City of Dearborn,* 394 Mich. 229, 231 N.W.2d 226 (1975). *Roseville Community School Dist. v. Fed. of Teachers,* 137 Mich.App. 118, 357 N.W.2d 829 (1984); *International Brotherhood of Teamsters' etc. v. Shapiro,* 138 Conn. 57, 82 A.2d 345 (1951).

3. *Clinton Water Association v. Farmers Construction Company,* 163 W.Va. 85, 254 S.E.2d 692 (1979); *Barber v. Union Carbide,* 172 W.Va. 199, 304 S.E.2d 353 (1983); *State Ranger Fuel Corporation v. Lilly,* 165 W.Va. 98, 267 S.E.2d 435 (1980); *Baker Mine Service, Inc. v. Nutter,* 171 W.Va. 770, 301 S.E.2d 860 (1983).

bond filed to perfect the appellants' appeal to this Court and that appellants have an ongoing financial relationship with Mr. Tucker's bank. Thus, from the conduct of both parties it appears reasonable to infer that when they entered into their agreement to arbitrate they envisaged that each side would name an arbitrator friendly to that side and that those two arbitrators would then name an impartial umpire.

One of the leading cases on arbitration in the United States is *Commonwealth Corp. v. Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), where the Supreme Court of the United States set aside an arbitration agreement because the third arbitrator (impartial umpire) under an arbitration clause similar to the one in the case before us had an undisclosed relationship as an engineering consultant with one of the parties. In *Commonwealth* there were two concurring opinions and three dissenting opinions. When the concurring opinion of Mr. Justice White, joined by Mr. Justice Marshall, is added to the majority opinion by Mr. Justice Black, it becomes obvious that the supreme court of the United States, under the United States Arbitration Act, 9 U.S.C. §§ 1–14 will look only at the impartiality of the neutral umpire.

The U.S. Supreme Court seems willing to accept the obvious, namely that under the standard arbitration clause where each party selects one arbitrator and the two so selected choose a third, the parties expect their personally-named arbitrators to be advocates for each respective position. In this regard, Mr. Justice White said in his concurring opinion:

> The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges. It is often because they are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function. *Cf. United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 [80 S.Ct. 1347, 4 L.Ed.2d 1409] (1960). This does not mean the judiciary must overlook outright chicanery in giving effect to their awards; that would be an abdication of our responsibility. But

it does mean that arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial.

The New York Court of Appeals, a court particularly expert in commercial matters, has gone even further in recognizing that under a standard tripartite arbitration clause the arbitrators named by the parties will inevitably be individuals that the parties believe are favorably disposed to their side. Thus in *Astoria Medical Group v. HIP*, 11 N.Y.2d 128, 227 N.Y.S.2d 401, 182 N.E.2d 85 (N.Y.1962), the New York court said:

> "In short, usage and experience indicated that, in the type of tripartite arbitration envisaged by the contract before us, each party's arbitrator 'is not individually expected to be neutral.'"

227 N.Y.S.2d at 405, 182 N.E.2d at 88.

■ In fact, the court in *Astoria* recognized the right to appoint one's own arbitrator as a "valuable" contractual right:

> "The right to appoint one's own arbitrator, which is the essence of tripartite arbitration ... would be of little moment were it to comprehend solely the choice of a 'neutral.' It becomes a valued right, which parties will bargain for and litigate over, only if it involves a choice of one believed to be sympathetic to his position or favorably disposed to him."

182 N.E.2d at 88. The court in *Astoria* finally concluded that the contract provision, similar to the one in the case before us, contained no word of limitation on the identity, status or qualifications of the arbitrators; had the parties intended that their appointees be completely impartial or disinterested, they could have readily so provided.

■ Similarly, the Florida courts have adopted the same practical rule. In *Lee v. Marcus*, 396 So.2d 208 (Fla.App.1981), appellants contended the individual appointed by the appellees to tripartite arbitration was not neutral or unbiased because of an

unrevealed association with appellees' attorney. The court rejected the argument and held:

> Accordingly, it has been held, seemingly without exception, that—absent overt corruption or misconduct in the arbitration itself, which is not alleged here—no arbitrator appointed by a party may be challenged on the ground of his relationship to that party.

396 So.2d 208, 209. *See also Finkelstein v. Smith*, 326 So.2d 39 (Fla.App.1976).

In the case before us there is no allegation of "outright chicancery," "overt corruption," or "misconduct in the arbitration itself." As the record amply reveals, both parties appointed arbitrators who were favorably disposed to them, and that is what both had envisaged in the arbitration provision of the lease when they entered into it. Indeed, had Mr. Fish accepted a bribe for endorsing a favorable report, or had Mr. Morton, the neutral umpire, enjoyed a substantial, undisclosed business relationship with the appellees, then the threshold of actual fraud alluded to in footnote 7 of *Bd. of Education v. Miller, supra,* would have been reached. Under the facts of this case, however, we find that the arbitrators behaved properly and that the award in this case was exemplary. Accordingly, with regard to all issues raised by the appellants on this appeal, the judgment of the Circuit Court of Nicholas County is affirmed.

### IV

The appellees cross-assign as error the failure of the circuit court to award them prejudgment interest. On this issue we agree with the appellees. All considerations relating to the time value of money up to the point when an arbitration award is entered should be taken into consideration by the arbitrators. The arbitrators' award, then, should reflect the total amount to which the prevailing parties are entitled at the time the decision is rendered. Thereafter, however, if the losing party to an arbitration proceeding declines to pay the award and elects to litigate the matter in the courts, the losing party must pay prejudgment interest until judgment is

entered in the circuit court, and must then pay post-judgment interest until the award is actually tendered. *W. Va. Code,* 56–6–31 [1981]. This follows from the fact that an arbitration award is similar to liquidated damages if the award must be enforced by suit in circuit court. Accordingly, this case is remanded to the circuit court with directions to enter judgment for appropriate interest.

Affirmed in part, Reversed in part, Remanded with directions.