**PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation, Plaintiff,**

v.

**U.S. BANK TRUST NATIONAL ASSOCIATION, a Minnesota corporation, Defendant.**

**No. Civ. 98–1332–HA.**

United States District Court, D. Oregon.

Jan. 26, 1999.

David Anton Aamodt, Portland General Corp. Legal Dept., Portland, OR, David B. Markowitz, William N. Mehlhaf, Markowitz Herbold Glade & Mehlhaf PC, Portland, OR, for Portland General Elec. Co.

Donald H. Pyle, Lane Powell Spears & Lubersky, Portland, OR, Philip Le B. Douglas, Takemi Ueno, Winthrop Stimson Putnam & Roberts, New York City, for Trust 1 US Bank Trust Nat. Ass'n.

Thomas Healy Tongue, Kathryn M. Pratt, Dunn Carney Allen Higgins & Tongue, Portland, OR, Joseph G. Finnerty, III, Eric S. Connuck, Piper & Marbury LLP, New York City, for Trusts 2 & 3 US Bank Trust Nat. Ass'n.

Thomas V. Dulcich, Schwabe Williamson & Wyatt, Portland, OR, for Keith N. Olds, Earl A. Thorsfeldt, Commercial Equipment Appraisers, Inc., movants.

Stephen L. Griffith, Stoel Rives, Portland, OR, for Enron Corp., movant.

## OPINION AND ORDER

HAGGERTY, District Judge.

### I. Introduction

Pending before the court is Plaintiff Portland General Electric Co.'s ("PGE's") motion for a declaratory judgment against Trusts No. 2 and 3 of Defendant U.S. Bank Trust National Association ("U.S.Bank"). For the foregoing reasons, the motion shall be granted, and an order shall be entered finding the December 17, 1998 full report of the appraisal of the generator equipment contained in exhibit 4 of plaintiff's memorandum is binding on the parties.

### II. Background

Twenty-five years ago Plaintiff PGE, an electrical company based in Portland, Oregon, leased four generator "units," under two Lease Agreements, from the Bank of California National Association ("Bank of California"). Apparently, the Bank of California held title to the generators through three separate trusts ("Trusts No. 1, 2, and 3"), two through Trust No. 1 and one each through Trusts No. 2 and 3. Through a series of acquisitions and assignments, Defendant U.S. Bank eventually became trustee for the trusts.

Both Lease Agreements terminate on August 8, 1999. Under § 24 of both Lease Agreements, PGE has the option to (1) renew them for an additional five-year term at fair market rental value, (2) purchase the units at fair market sales value, or (3) do nothing and let the Leases expire. PGE has until February 7, 1999 to make its decision. Under § 24 of the Lease Agreements, by giving written notice no earlier than one year prior to expiration of the lease, PGE could request those values be determined. If the parties failed to agree upon those values before ten months prior to expiration of the Lease Agreements (October 8, 1998), the Agreements allowed PGE to request an independent appraisal of the value of the equipment. If within 15 business days of the request for appraisal the parties failed to agree on who would be the independent appraiser, either party could request the American Arbitration Association ("AAA") to appoint an independent appraiser.

PGE filed this action on October 27, 1998 asking the Court to appoint an appraiser and instruct that appraiser how to determine the fair market rental value and fair market sales value. On November 13, 1998, the AAA appointed Carl Bloomquist of Marshall & Stevens, Inc. as the inde-

pendent appraiser of the units owned by Trusts No. 2 and 3.[1] At a hearing on November 24, 1998, this court ruled that under Ninth Circuit case law, *Raytheon Co. v. Rheem Manuf. Co.,* 322 F.2d 173 (9th Cir.1963), as well as the Federal Arbitration Act ("FAA"), this court had no authority to instruct the appraiser how to determine those values.

On December 14, 1998, Bloomquist, the appraiser, issued a letter by facsimile summarizing his assessment of the equipment owned by Trusts No. 2 and 3. He found that the fair market sales value of the units was $24,000,000 and the fair market rental value of the units was $24,869,407. He stated in the letter that the actual report would be forthcoming on Friday, December 18, 1998. Before issuing the body of the report, however, on December 17, 1998, Bloomquist sent the parties a two-paragraph facsimile stating that he had discovered an error in his calculations. He revised his appraisal so that the sales value was $27,500,000 and the rental value was $24,455,154. He then issued the full report. On January 6, 1998 he sent another facsimile to the parties explaining the valuation change, at the request of a PGE representative.

> The value change was a result of adjustments made to a risk factor costs [sic] and because of a miscalculation (where the future market value was calculated as of December 31, 1999–as opposed to the actual valuation date of August 8, 1999). As current and immediate future markets for used gas turbine equipment appear strong, volatile, and time sensitive, the adjustments resulted in change to the market value in continued use as presented in the final report.

(Plaintiff's Memorandum, ex. 5.)

PGE requests a declaratory judgment from this court establishing whether the revision was valid even though it occurred outside the thirty-day time period established by the contract. PGE claims it is unable to determine which option to exercise, if either, because it now has "two appraisals" with different valuations of the sales value and rental value in each. It also argues that the December 17th revisal was invalid because it occurred outside the time frame set forth in the contract. If faced with the possibility of having no binding appraisal, however, PGE is willing, as an alternative, to accept the December 17th revision rather than be left with no valid appraisal whatsoever. (*See* docs. 50 and 51.)

## II. DISCUSSION

### A. Functus Officio

■ PGE argues that upon rendering the initial December 14, 1998 facsimile, the appraiser's power to issue a decision terminated and under the doctrine of "functus officio"[2] he had no authority to correct his erroneous decision. This common-law doctrine has been described by commentators as follows:

> When an award has been made, the authority of the arbitrator comes to an end. He become functus officio. Under general principles of arbitration law he cannot in any way change or explain his award unless his authority is reinstated in writing by all parties, or the matter is returned to him by the appropriate court.

*In re Arbitration of the Board of Directors of the Association of Apartment Owners of Tropicana Manor,* 73 Haw. 201, 830 P.2d 503, 507 (1992) (quoting Domke on Commercial Arbitration § 32:01, at 458–59 (rev. ed.1991)). The policy underlying the doctrine is based on "an unwillingness to permit one who is not a judicial officer and who acts informally and sporadically, to reexamine a final decision which he has already rendered, because of the potential

---

1. The parties agree that PGE's request for this court to appoint an appraiser is moot.

2. The Latin term "functus officio" means "a task performed." *In re Arbitration of the*

*Board of Directors of the Association of Apartment Owners of Tropicana Manor,* 73 Haw. 201, 830 P.2d 503, 507 n. 5 (1992).

evil of outside communication and unilateral influence which might affect a new conclusion." [3] *McClatchy Newspapers v. Central Valley Typographical Union No. 46,* 686 F.2d 731, 734, *cert. denied* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982) (quoting *La Vale Plaza, Inc. v. R.S. Noonan, Inc.,* 378 F.2d 569, 572 (3d Cir.1967)).

■ In arguing that the doctrine of functus officio applies, PGE ignores an essential precondition to its use: finality. The doctrine applies "once an arbitrator has made and published a *final* award[.]" *International Brotherhood of Teamsters v. Silver State Disposal Serv., Inc.,* 109 F.3d 1409, 1411 (9th Cir.1997) (quoting *McClatchy,* 686 F.2d at 734) (emphasis added). Drafts of an award are not considered final. *Local P–9, United Food & Com. Workers v. George A. Hormel & Co.,* 776 F.2d 1393, 1395 (8th Cir.1985). "In order for an arbitrator's award to be considered final under the functus officio doctrine, two events must occur. First, the award must be complete, or executed, by the arbitrator. Second, the award must be delivered or declared." *United Steelworkers of Am. v. Ideal Cement Co.,* 762 F.2d 837, 842 (10th Cir.1985). "The objectively determinable intent of the arbitrator governs whether an award is final. Absent a clear articulation of intent, courts examine the arbitrator's actions to determine whether an award was final." *United Mineworkers of Am. v. Sunnyside Coal Co.,* 841 F.Supp. 382, 385 (D.Utah 1994).

■ Here, the cover page of the initial facsimile of December 14th makes it clear that the information contained in the attached letter was not intended to be final. It stated,

> Attached are the first two pages of our report which present our opinion of market value in continued use and fair rental value of the subject assets. *You will have the final report by Friday.*

(Plaintiff's Memorandum, ex. 2) (emphasis added). In addition, the letter itself states,

> Descriptions of the assets appraised, together with explanations of the appraisal procedures used, are presented in the report.
>
> *The value opinions expressed in this appraisal are contingent upon the analyses, facts, and conditions presented in the accompanying report.*

(*Id.*) (emphasis added). This is objective evidence that the appraiser did not intend the short December 14th summary to be final.

Additionally, the initial facsimile was not signed by Bloomquist, but simply signed as "Marshall & Stevens Incorporated," apparently by someone else at the appraisal company. (*Id.*) As noted by Trusts No. 2 and 3, the Uniform Standards of Professional Appraisal Practice ("USAP"), adhered to by the appraiser, requires that in order for an appraisal to be final it must be personally signed and certified by the arbitrator. USAP Rule 8–3. As such, it was not properly executed, and it is strong objective evidence that the appraiser did not intend for it to be final. On the other hand, the arbitrator followed these dictates when rendering the full report on December 17, 1998.[4] (*See* Plaintiff's Memoran-

---

**3.** The doctrine of functus officio is subject to three exceptions. "An arbitrator can correct a mistake which is apparent on the face of his award, complete an arbitration if the award is not complete, and clarify an ambiguity in the award." *Silver State Disposal,* 109 F.3d at 1411 (quoting *McClatchy,* 686 F.2d at 734 n. 1). The mistake-on-the-face-of-the-award exception "is designed for cases of clerical mistakes or obvious errors of arithmetic computation." *Teamsters Local 312 v. Matlack, Inc.,* 118 F.3d 985, 992 (3rd Cir.1997). Trusts No. 2 and 3 do no argue this exception applies, likely because the mistake in dates does not

appear on the face of the December 14th facsimile and exactly how it affects the computation is difficult to discern in light of the complicated nature of the formula. They do argue, however, that the court has the authority to modify the award as it is based upon an "unambiguous mistake of fact."

**4.** PGE contends the full report was also signed "Marshall & Stevens Incorporated"; however, a careful examine of the report reveals that while a letter introducing the full report was signed as such, the report itself was personally signed and certified by Bloom-

dum, ex. 4 at 23–24.) The certification and personal signature cover two pages and contain nine points of certification. (*Id.*) This is strong objective evidence that the arbitrator intended the full December 17th report to be the final version.

As it is clear that the facsimile of December 14th facsimile was neither intended to be final nor properly executed, the doctrine of functus officio does not apply. *Silver State*, 109 F.3d at 1411; *Ideal Cement*, 762 F.2d at 842.

**B. Language of the Lease Agreements**

■ PGE's argument that the December 14, 1998 facsimile was a binding, final decision of the appraiser and that the December 17, 1998 revision had no effect is based on a strict interpretation of the appraisal provision of the parties Lease Agreements. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 56, 115 S.Ct. 1212, 1216, 131 L.Ed.2d 76 (1995) (private agreements to arbitrate are enforced according to their terms); *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248, 1256, 103 L.Ed.2d 488 (1989) ("Parties are generally free to structure their arbitration agreements as they see fit.") Despite PGE's characterization of the appraisal description in the Lease Agreements as a jurisdictional mandate stripping the appraiser of all authority to issue a decision outside the specified time frame, the language of the contract itself does not support this contention.

Section 1 of the Lease Agreements provides, "Any appraiser appointed pursuant to the [specified appraisal] procedure *shall be instructed to determine the fair market sales value or the fair market rental value,* as the case may be, of such Unit or Units *within 30 days after his appoint-*

quist in accordance with USAP standards. (*See* Plaintiff's Memorandum, ex. 4 at 4 and 23–24.)

5. Although during oral argument PGE asserted there is a common-law rule that arbitration deadlines must be strictly enforced, it

*ment* and his determination thereof shall be final." (Plaintiff's Memorandum, ex. 1 at § 1.) Based on this language PGE argues that because the facsimile correcting the error arrived outside the 30–day period, it was invalid. This argument is without merit.

Section 1 of the lease agreements does not create a strict deadline outside of which an appraisal would be invalid. Although there is little authority on this subject, the authority that exists is clear.[5] In *King v. Stevenson*, 445 F.2d 565, 569–70 (7th Cir.1971), the Seventh Circuit stated,

> In order to determine whether time was of the essence in completion of the appraisal, our inquiry must be directed to the intent of the parties, expressly stated or inferable from the circumstances of the transaction. Ordinarily, time is not of the essence unless made so by express stipulation of the parties or by virtue of the exigencies of the transaction itself. *Absent express stipulation, the focus should be upon the prejudice attending delay* and upon the nature of the task to be performed.

*Id.* (emphasis added). The court found that the 30–day appraisal deadline could not be construed as a mandatory requirement or a rigid timetable, because doing so would ignore the realities of the appraisal process and create an opportunity for the parties to engage in activities that might delay the appraisal process if it were to their advantage to evade the appraiser's authority. *See id.* Likewise, in *Anderson v. Nichols*, 178 W.Va. 284, 359 S.E.2d 117 (1987), the Supreme Court of West Virginia rejected a similar argument.

> Appellants would have us believe that it is of great moment that the arbitration award was rendered six days later than specified in the arbitration agree-

cites to no cases in analogous circumstances supporting its contention. Rather, it attempts to distinguish the *King* and *Anderson* cases on their facts, because they are the only cases involving de minimis delays of arbitral decisions outside contractual deadlines.

ment. Had the arbitration clause provided that time was of the essence in the arbitration process we might agree with the appellants; however, there was no agreement by the parties that a late award would nullify the whole arbitration proceedings and we see no reason to set aside an otherwise exemplary decision for a de minimis delay.

A fair reading of the cases indicates that in instances when an arbitration award is delayed, courts must apply a rule of reason. The threshold question then becomes whether the party raising the delay issue has been prejudiced by the delay.

*Id.* at 121.

As in *King* and *Anderson*, § 24 of the Lease Agreements does not contain language stripping the appraiser of authority in the event of a late appraisal. In fact, the language of the contracts in *King* and *Anderson* was even more mandatory in nature, specifying that the appraisals "shall" be rendered within the deadline. Here, the language of § 1 specifies only that the appraiser *"shall be instructed* to determine the fair market sales value or the fair market rental value, as the case may be, of such Unit or Units within 30 days[.]" (Plaintiff's Memorandum, ex. 1 at § 1) (emphasis added). Contractual language that the appraiser "shall be instructed" to complete the appraisal in thirty days appears to be even less mandatory in nature than the relevant language in *King* and *Anderson*. Nothing in the Lease Agreements specifies that time is "of the essence" with regard to the appraisal procedure, and they do not provide that a late appraisal would be a nullity. Thus, this case falls squarely within the reasoning of those decisions. *See King*, 445 F.2d at 569–70; *Anderson*, 359 S.E.2d at 121.

PGE's able counsel attempts to avoid the rational of *King* and *Anderson* through a series of creative distinctions. Upon examination, however, the distinctions fall apart.

PGE contends this case is different from the *Anderson* decision in that PGE

has been prejudiced by the delay in receiving the corrected valuation. First, it is important to note that the corrected valuations arrived a mere four days late, on December 17, 1998. At the same time, PGE had almost two months, until February 7, 1999, to exercise its option on the generator units. Second, while PGE suggests that as a public utility it must carefully plan its decisions in advance, there is no evidence PGE had already taken steps to act upon the initial, erroneous valuations in the three days that elapsed before receiving the corrected figures. Third, it should also be noted that PGE's motion for declaratory relief was not filed until January 11, 1999, almost a full month after the claimed "prejudicial" appraisal. If a three-day delay were of such importance, one would suspect the motion for a declaratory judgment would have been filed far sooner. Fourth, PGE also contends that it was prejudiced because the revised valuation consists of a substantially higher sales value than the initial valuation, although it acknowledges that the initial valuation was based upon erroneous information. In effect, PGE is arguing that it has been prejudiced because it is not able to take advantage of a windfall. While it is understandable that PGE desires a lower valuation, that does not mean it has been prejudiced when the lower valuation was based upon inaccurate information and the higher valuation was based upon accurate information. Fifth, the very fact that PGE is willing to accept the revision as an alternative to being without an appraisal altogether demonstrates that it has suffered no prejudice. The purpose of the appraisal procedure contained in the Lease Agreements was to give PGE a valuation upon which it could base its decision to purchase the equipment, renew the Leases, or allow them to expire. The appraisal allows PGE to do just that, and it has received what it bargained for.

Next, PGE argues that the *Anderson* decision was based upon that court's concern that the party who was dissatisfied with an arbitration award might use the

delay issue "only to establish colorable grounds for challenging an otherwise just and reasonable award to postpone paying off the winner." 359 S.E.2d at 121. PGE contends that since that is not the case here, *Anderson* does not apply. There is no reason why the "rule of reason" adopted by the *Anderson* court should not be used in other circumstances where a de minimis delay has not prejudiced the parties.

PGE also argues that language in *King* demonstrates that this court may strictly enforce a thirty-day deadline, even though there was no language in the appraisal provision to that effect. It bases its argument on the following language from *King:* "Ordinarily, time is not of the essence unless made so by express stipulation of the parties or by virtue of the exigencies of the transaction itself." 445 F.2d at 569. PGE contends that the exigencies of the appraisal process in this case allow the court to construe the deadline as strict, noting that the Lease Agreements allow only three-and-a-half months between designation of an appraiser and the date by which PGE must make its decision. Under the facts of this case PGE still had almost two months to make its decision after the four-day delay in receiving the corrected valuations. This appears to have been plenty of time in which to make this decision. Once again, PGE is asking this court to rewrite the contract language. Such interference is simply not warranted.

Finally, PGE tries to distinguish *King* and *Anderson* on the ground that since the arbitrators in those cases issued only one decision, the entire arbitration process in those cases would have been void if the courts had ruled otherwise. PGE argues there are "two" appraisals instead of one

in this case, so the entire arbitration process would not be undermined if the late decision were disregarded. In actuality, however, it appears *both* appraisals in this instance were late, even assuming there were two separate decisions as PGE claims.[6] The December 14th facsimile was sent thirty-one days after Bloomquist was appointed. Consequently, PGE's attempt to distinguish *King* and *Anderson* on the ground that the arbitrators in those cases issued only one decision and the entire arbitration process in those cases would have been void if the courts had ruled otherwise fails. Under a fair application of PGE's argument that the thirty-day deadline was hard and fast, the entire appraisal here would be void as well because both appraisals were late.

In summary, the "revised appraisal" was not invalid because it fell a few days outside the thirty-day time frame for the appraisal, and PGE has shown no prejudice from the correction.[7]

Therefore, for the foregoing reasons,

**IT HEREBY IS ORDERED:**

1. Plaintiff's motion to file a supplemental complaint, (doc. 49), is granted. Defendants are not required to respond to it.

2. Plaintiff's motion for declaratory judgment against Trusts No. 2 and 3, (doc. 57), is granted as follows: The December 17, 1998 appraisal is binding.

3. Trusts No. 2 and 3's request to be dismissed from this action is granted. (*See* doc. 61.) Trusts No. 2 and 3 may file appropriate materials in

---

**6.** PGE argues that because December 13, 1998 was a Sunday, allowing the appraisal to be filed on Monday, December 14th, would be appropriate. However, no such allowance for counting days is provided in the contract, and PGE admitted in oral argument that the AAA rules do not specify how days should be counted. PGE cannot have it both ways. If the court were inclined to apply a steadfast

thirty-day limitation, then both facsimile appraisals fell outside the contract period, and both would be invalid.

**7.** As PGE's argument to exclude the December 17, 1998 revision fails, the court need not address Trusts No. 2 and 3's argument that the court has the power to modify the appraisal.

support of their request for attorneys' fees. (*See id.*)